IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**NICHOLAS CARROLL** | **CRIMINAL ACTION**<br><br>**NO. 24-246-KSM-1** |

**MEMORANDUM**

**Marston, J.**                                                                                                                                                              **September 27, 2024**

      Before the Court is Defendant Nicholas Carroll's appeal of the detention order of United States Magistrate Judge Pamela A. Carlos. (Doc. No. 16.) Following Defendant's detention hearing on July 16, 2024, Judge Carlos granted the Government's motion for pretrial detention, finding that there was no combination of conditions that could assure the safety of others in the community and Defendant's appearance in court. (Doc. Nos. 13, 19.) Defendant was ordered detained pending trial. (*Id.*) On August 14, 2024, Defendant appealed, and filed a motion for bail pending trial in this Court. (Doc. No. 16.) The Government opposes the motion. (Doc. No. 17.) The Court held a hearing on the motion on September 19, 2024.[1] (Doc. No. 28.) For the reasons stated by the Court in denying the motion during the hearing, and for the supplemental reasons set forth below, the Court denies Defendant's motion. Magistrate Judge Carlos's order is affirmed, and Defendant shall be detained pending trial.

---

[1] The Court had initially scheduled the hearing on the motion for September 5, 2024, but it was rescheduled due to scheduling conflicts. (*See* Aug. 20, 2024 email from Defendant's counsel.)

I.  **Standard of Review**

This Court has jurisdiction to review the Judge Carlos's decision under 18 U.S.C. § 3145(b).  *See* 18 U.S.C. § 3145(b) ("If a person is ordered detained by a magistrate judge, . . . the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order.").  This Court is required to conduct a *de novo* review of a magistrate judge's ruling.  *See United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985).  In conducting this review, the district court may rely on the transcript of the proceeding before the magistrate judge.  *Id.* at 1395 n.3; *see also United States v. Brown*, Criminal No. 20-535 (SRC), 2020 U.S. Dist. LEXIS 170687, at *5 (D.N.J. Sept. 17, 2020) (citing *United States v. Koenig*, 912 F.3d 1190, 1193 (9th Cir. 1990)) ("The district court may rely on the evidence in the record of proceedings before the magistrate judge, or in its discretion, choose to hold an evidentiary hearing if the court determines it would be necessary or useful in its determination.").

The Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, governs the pretrial detention of federal defendants.  The Act provides that, "[i]f, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial."  18 U.S.C. § 3142(e)(1).  The statute also provides that if the judicial officer finds there is probable cause[2] that the defendant committed an offense for which the maximum term of imprisonment is or exceeds 10 years under the Controlled Substances Act, or committed an offense under 18 U.S.C. § 924(c), "it shall be *presumed* [subject to rebuttal by the defendant] that no condition or

---

[2] A grand jury's indictment is "sufficient to support a finding of probable cause." *United States v. Suppa*, 799 F.2d 115, 119 (3d Cir. 1986).

combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." *Id.* § 3142(e)(3)(A), (B) (emphasis added).

The statutory presumption of detention applies here for two reasons. First, Defendant faces a maximum sentence of life in prison and a ten-year mandatory minimum sentence for violation of 21 U.S.C. § 841(a)(1), (b)(1)(B). Second, Defendant has been charged with possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c). (Doc. No. 1.)

To rebut the statutory presumption, "[t]he defendant must produce some credible evidence forming a basis for his contention that he will appear and will not pose a threat to the community." *United States v. Carbone*, 793 F.2d 559, 560 (3d Cir. 1986). To assess the likelihood of such contention, the Court considers the following:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
> > (a) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> >
> > (b) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

  (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

If the defendant rebuts the presumption, the burden of persuasion remains with the Government, which must provide that (1) the defendant poses a flight risk by the preponderance of the evidence; or (2) the defendant is a danger to the safety of any other person and the community by clear and convincing evidence. *United States v. Himler*, 797 F.2d 156, 160–61 (3d Cir. 1986); *United States v. Furxhiu*, Crim. A. No. 24-224, 2024 U.S. Dist. LEXIS 135093, at *10 (E.D. Pa. July 31, 2024).

## II. Findings of Fact

The Court makes the following Findings of Fact with respect to pretrial detention:

  A. **The Underlying Conduct**

  1. On July 3, 2024, a federal grand jury returned a bill of indictment charging Defendant with three counts: (1) one count of knowingly and intentionally possessing with intent to distribute 40 grams or more, that is, approximately 101.9 grams of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propenamide ("fentanyl"), a Schedule II controlled substance, on or about May 13, 2023, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B); (2) one count of knowingly possessing a black Springfield Armory XD, .45 caliber handgun bearing serial number US713731, in furtherance of a drug trafficking crime for which he may be prosecuted in a Court of the United States, that is, possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1), on or about May 13, 2023, in violation of 18 U.S.C. § 924(c); and (3) one count of knowingly possessing a black Springfield Armory XD, .45 caliber handgun bearing serial number US713731 on or about May 13, 2023 despite knowing he had been previously convicted in a

court of the Commonwealth of Pennsylvania of a crime punishable by imprisonment for a term exceeding one year, and the firearm was in and affecting interstate and foreign commerce, in violation of 18 U.S.C. § 922(g)(1).  (Doc. No. 1.)

2. The Drug Enforcement Administration ("DEA") began an investigation of Defendant after learning that Defendant's phone number had appeared in a case involving the importation of xylazine (also known by the street name, "tranq")[3] into the United States.  (Doc. No. 6 at 2.)  The DEA then learned that U.S. Customs officials had seized a package addressed to Defendant at a commercial P.O. box that contained parts for a drug pill press machine.  (*Id.*)

3. As part of the investigation into Defendant's drug trafficking activities, the DEA executed a search warrant on Defendant's iCloud account which revealed messages about Defendant's ability to press pills, supply of xylazine to drug trafficking organizations in Philadelphia, and Defendant's arrangement of sales of narcotics to various individuals using the internet.  (*Id.*)

4. On May 16, 2023, the DEA executed a search warrant at Defendant's home in Philadelphia.  (*Id.* at 3.)  Upon entry, Defendant admitted that there was a handgun and two pill presses in the house.  (*Id.*)  The DEA recovered a loaded black Springfield Armory XD .45 caliber handgun on the sofa in the living room as well as two large metal pill presses.  (*Id.*)  In addition, law enforcement seized multiple bags of fentanyl, fluorofentanyl, acetyl fentanyl, multiple bags of bromazolam (a synthetic benzodiazepine), multiple bags and containers of xylazine, pressed pills with the M30 logo, blenders, digital scales, five handgun magazines and one box of 9mm ammunition.  (*Id.*)

---

[3] Xylazine, or "tranq," is a horse tranquilizer that is often combined with fentanyl to create a potentially deadly high. (Doc. No. 16 at 4.)  It can also cause large skin wounds, which, when severe, can lead to amputation of a person's limbs. (*Id.*)

5. At the time of the search, Defendant gave a voluntary statement to the DEA and admitted he was using the pill presses to mix synthetic benzodiazepines with xylazine and then selling the pills as counterfeit oxycodone pills with the M30 stampings. (*Id.*) Defendant further stated that he sold between 2,000 to 2,500 pills a month to individuals he met online and that he bought bulk quantities of fentanyl (between 50 to 250 grams at a time) from a source in Kensington. (*Id.*) Defendant claims the most fentanyl he bought at one time was 500 grams. (*Id.*) Finally, Defendant explained he sometimes traded xylazine for fentanyl and detailed how he imported xylazine from an equine business in Argentina. (*Id.*)

6. After the grand jury returned the bill of indictment, Defendant was arrested on July 8, 2024. (*Id.* at 1.) At the time of his arrest, Defendant gave the DEA agents consent to search his vehicle, who subsequently recovered another pill press and a rifle firearm box. (*Id.*) The DEA also searched Defendant's residence after obtaining consent from his girlfriend and seized additional quantities of suspected fentanyl. (*Id.*)

**B.    Defendant's Background**

1. Defendant was born and raised in Philadelphia. He obtained a doctoral degree in pharmacology[4] in 2014 from Temple University and was previously employed in the pharmaceutical industry, most recently as the Associate Director for Clinical Pharmaceuticals at Amicus Therapeutics from 2023–24. (July 16, 2024 Pretrial Services Report at 2.) Defendant has approximately ten years of experience in the pharmaceutical industry, including as a clinical

---

[4] The Pretrial Services Report says that Defendant received his PhD in pharmacy, but the Court understands instead that Defendant received his degree in pharmacology. (Doc. No. 16 at 2; *see also* Draft Hr'g Tr. at 5:19–22, 14:9–13 (Defendant's counsel explaining that Defendant has a degree in pharmacology).)

scientist. (*Id.*) At the time of Defendant's arrest on July 3, 2024, Defendant was unemployed and receiving unemployment compensation.[5] (*Id.*)

2. Defendant was previously arrested by the Philadelphia Police Department on May 7, 2021 for posing as a healthcare worker to obtain xylazine. (July 16, 2024 Pretrial Services Report at 3; Doc. No. 6 at 2.) On December 13, 2021, Defendant pled guilty to identity theft, use/possession of drug paraphernalia, and impersonating a notary public and was sentenced to three years' probation. (*Id.* at 3–4.)

3. Although at the time of his arrest on the pending charges Defendant stated he was in excellent physical health and had no medical problems (*id.*), Defendant now discloses that he has open wounds on his forearms due to his own use of xylazine[6] (Doc. No. 16 at 4). Defendant states that he was involved in a motorcycle accident in 2016 and was prescribed opiates, but that he developed an addiction and turned to the streets after his physician would no longer supply a prescription for the drugs. (Doc. No. 16 at 3–4.) Defendant states he used both fentanyl and xylazine. (*Id.* at 4.) Defendant admitted he had previously attended an inpatient treatment facility for his addiction, but stated that he relapsed within a year after finishing treatment. (Draft Hr'g Tr. at 7:4–10.)

4. Defendant has been detained in the FDC since his arrest and he has not incurred any disciplinary infractions while in custody. (Doc. No. 16 at 3; Sept. 16, 2024 Pretrial Services Mem. at 2.) Defendant states he is now in the state of mind to take advantage of inpatient

---

[5] Defendant's motion states that Defendant was gainfully employed until the time of his arrest (Doc. No. 16 at 2), but this does not appear to be accurate as Defendant told Pretrial Services that he was unemployed and receiving unemployment compensation (July 16, 2024 Pretrial Services Report at 2).

[6] Defendant has been provided with protective sleeves to wear from the medical staff at the Federal Detention Center ("FDC"). (Doc. No. 16 at 4.) Defendant claims the FDC medical staff is not able to properly care for Defendant's wounds and that his wounds could result in amputation if left untreated. (*Id.*) No medical records were admitted into evidence.

treatment for his substance abuse addiction. (Doc. No. 16 at 6.) The U.S. Pretrial Services Office confirmed that Defendant is eligible to start inpatient treatment at Beacon Point Recovery Center where a bed is available and, upon completion of a 30-day program, could be placed on electronic location monitoring while residing at his parents' residence in the District of New Jersey. (Sept. 16, 2024 Pretrial Services Mem. at 1–2.)

5.      Defendant's parents and sister live in the District of New Jersey, and his two brothers live in Philadelphia. (July 16, 2024 Pretrial Services Report at 1.) He states that his family is willing to have Defendant reside at their home after he completes inpatient treatment. (Draft Hr'g Tr. at 3:23–4:16.) Defendant also states that because his mother is a registered nurse, she would be able to more easily discern if Defendant is under the influence of drugs, and that because his father is retired, he would always be present to assure Defendant abided by his conditions of release. (*Id.*)

**III.   Discussion**

As stated above, a rebuttable presumption of pretrial detention applies in this case. Defendant argues that he has rebutted the statutory presumption and that he should be released to attend substance abuse inpatient treatment for 30 days and then be placed on home detention with location monitoring. (Doc. No. 16.) Defendant argues he is not a risk of danger to the community because he has never been convicted of a crime of violence and there is no evidence that the firearm seized in this case was ever "used, brandished and/or discharged." (*Id.* at 6.) Defendant recognizes he has a drug addiction, but claims that the time he has already spent in custody since his arrest on July 8, 2024 has given him the chance to "dry out" and he is now in a different frame of mind and ready to address his substance abuse addiction. (*Id.*) Defendant explains that inpatient treatment will give him the opportunity to battle his addiction and that

release to home detention with his parents in New Jersey with location monitoring will be sufficient to assure the safety of the community.  (*Id.* at 5–6.)  Defendant also claims, given his past employment history, his strong family ties, and no failures to appear related to his prior conviction, that home confinement with location monitoring and travel limitations will assure his appearance in court as required.  (*See generally id.*)

The Government opposes Defendant's release and argues that he has failed to rebut the statutory presumption and that no condition or combination of conditions will ensure the safety of the community or risk of nonappearance.  (Doc. No. 17.)  As to the danger to the community, the Government proffers that Defendant supplied large quantities of fentanyl to the Philadelphia community and manufactured counterfeit oxycodone pills that were laced with fentanyl, xylazine, and other synthetic additives.  (*Id.* at 3; Draft Hr'g Tr. at 20:13.)  Defendant allegedly conducted these offenses while on probation, showing his disregard for court orders and a lack of respect for the law.  (Doc. No. 17 at 3.)  Additionally, the Government argues that Defendant failed to stop his illegal activity even after the DEA executed a search warrant at his house in 2023 because at the time of his arrest, more than 13 months later, the DEA seized from his vehicle another pill press and a rifle firearm box, in addition to quantities of suspected fentanyl from his home.  (*Id.*; Doc. No. 6 at 1.)  And, although the Government recognizes Defendant's health issues, the Government contends that these health concerns "only amplify his danger to the community" because despite experiencing firsthand the serious side effects of his own use of xylazine, Defendant still repeatedly engaged in drug trafficking this very substance.  (Doc. No. 17 at 3–4.)  Last, the Government argues that Defendant is also a risk of flight because he faces a 10-year mandatory minimum penalty if he is convicted of the drug trafficking charge and a consecutive 5-year mandatory minimum penalty for the violation of 18 U.S.C. § 924(c).  (*Id.*)

Considering the relevant § 3142(g) factors, the Court finds that Defendant has failed to rebut the presumption of detention and there is no condition or combination of conditions that will ensure the safety of the community or the risk of nonappearance.

As to the first factor, the nature and circumstances of the offense charged, the charges against Defendant involve a large quantity of a dangerous controlled substance, fentanyl, as well as a dangerous cutting agent, xylazine, and a loaded firearm. (Doc. Nos. 1, 17.) These serious offenses are accompanied by a mandatory minimum sentence of 15 years imprisonment, and a maximum sentence of life imprisonment. The Court finds that these charges are of a very serious nature and that Defendant poses a risk of flight. *See United States v. Thompson*, No.4:16-CR-00019-19, 2018 U.S. Dist. LEXIS 7197 at *15 (M.D. Pa. Jan. 17, 2018) (holding that the defendant posed a risk of flight because of the mandatory ten-year minimum and maximum possible term of life imprisonment).

As to the second factor, the weight of the evidence against the person, the Government's evidence is substantial and consists of physical evidence in the form of multiple pill presses, firearm magazines, and other drug paraphernalia. (Doc. No. 6 at 2.) Defendant has also allegedly admitted that he was using pill presses to mix synthetic benzodiazepines with xylazine, stamping them with the "M30" logo, and selling them as counterfeit oxycodone; that he was selling 2,000 to 2,500 pills each month; that he bought fentanyl in bulk from a Kensington source in quantities of 50 to 250 grams; that he supplied the same group with xylazine and would trade xylazine for fentanyl; and that he imported xylazine from an equine business in Argentina. (*Id.* at 1–3.)

Third, considering the history and characteristics of Defendant, Defendant possesses a PhD in pharmacology and previously worked as both a clinical scientist and an associate director

in the pharmaceutical industry; yet, he appears to have used this knowledge to facilitate his drug trafficking. *See What is Pharmacology?*, UT Health San Antonio Long School of Medicine Department of Pharmacology, https://lsom.uthscsa.edu/pharmacology/what-is-pharmacology/ (last visited Sept. 24, 2020) ("In the broadest sense, pharmacology is the study of how chemical agents, both natural and synthetic (i.e., drugs) affect biological systems.").

    The Court recognizes that Defendant sadly suffered a traumatic accident in 2016, leading to an opiate addiction and that now the Defendant would like the opportunity to again participate in an inpatient treatment program.[7] (Doc. No. 16.)  Also, the Court notes Defendant's strong family ties, but the Court does not find this is enough to ameliorate against the Defendant's danger to the community or the risk of flight.  Defendant's loving and supportive family members have been a part of Defendant's life and yet Defendant has still managed to become deeply enmeshed in serious drug trafficking and firearms crimes.  *See United States v. Thompson*, No.4:16-CR-00019-19, 2018 U.S. Dist. LEXIS 7197 at *12 n.50 (M.D. Pa. Jan. 17, 2018) (citing *Delker*, 757 F.3d at 1396) ("Community ties have limited weight in the context of assessing whether a defendant presents a danger to the community.")

    Moreover, the Court notes that the alleged conduct in this case all occurred while Defendant was on probation—subject to both court supervision and restrictive conditions—from a state court conviction that involved Defendant's impersonation of a veterinary worker to obtain xylazine. (July 16, 2024 Pretrial Services Report at 3–4.); 18 U.S.C. § 3142(g)(3)(b) (requiring the Court to consider whether the defendant was on probation, parole, or on other release at the time of the current offense to determine whether the defendant rebutted the statutory

---

[7] The Court also recognizes that Defendant currently presents with skin wounds on both forearms caused by his prior use of xylazine (Doc. No. 16 at 4), but Defendant did not present any medical records to support his argument that the FDC is not able to treat this condition.  The Court is not persuaded this is sufficient to rebut the presumption in this case.

presumption). Yet, Defendant still allegedly engaged in even more serious behavior by trafficking large quantities of illegal drugs and possessing a firearm and ammunitions in contravention of federal law. *See United States v. Payne*, Crim. A. No. 20-222, 2021 U.S. Dist. LEXIS 24036, at *9–10 (E.D. Pa. Feb. 8, 2021) ("[T]he Court finds it significant that Mr. Payne has several prior convictions and was arrested for these [drug trafficking] charges while on parole for a state offense."); *Thompson*, 2018 U.S. Dist. LEXIS 7197, at *12 ("[D]espite testimony of Defendant's sister demonstrating some community and family ties, I am unpersuaded that his history and characteristics allow release given his previous felony drug convictions, his sporadic record of employment, his prior DUI charges, and previous failure to abide by terms of pre-trial detention.").

Finally, as to the fourth § 3142(g) factor, the nature and seriousness of the danger to any person or the community that would be posed by Defendant's release, the Court finds that Defendant poses a significant danger to the community. The Government proffers that Defendant allegedly represented to members of the Philadelphia community that he was selling oxycodone, a prescription medication, but was instead selling a potentially lethal mix of fentanyl, synthetic benzodiazepines and xylazine, a *horse tranquilizer*, that Defendant's counsel agrees can lead to a potentially deadly high and the skin wounds that Defendant presents on his own arms. (Doc. No. 6 at 3; Draft Hr'g Tr. at 20:13; Doc. No. 16 at 4.) Together with the evidence of Defendant's firearm possession, and recognizing the devasting impact of the opioid epidemic on the Philadelphia community—and Kensington in particular—these charges show the danger posed by Defendant if released. *See Payne*, 2021 U.S. Dist. LEXIS 24036, at *10–11 ("Mr. Payne was arrested for allegedly dealing heroin laced with fentanyl, a dangerous drug whose circulation undoubtedly endangers 'the community as a whole.' . . . [T]his particular drug deal

[was] more dangerous because the presence of fentanyl significantly increases the risk of overdose death.") (citing CDC statistics); *Sterling*, 459 F. Supp. 3d at 679 ("[B]ased on the evidence . . . thus far, there is a reasonable inference that Sterling has engaged in street level drug transactions on behalf of a drug trafficking group and carried weapons while doing so.  As a result, the Court finds Sterling would pose a significant danger to the community upon his release.").

\* \* \*

For these reasons, the Court finds that Defendant has failed to produce "credible evidence forming a basis for his contention that he will appear and will not pose a threat to the community." *Carbone*, 793 F.2d at 560.  Defendant has not overcome the statutory presumption of detention and there is no condition or combination of conditions that will reasonably protect the safety of the community and assure the appearance of Defendant as required.

**IV.     Conclusion**

For the foregoing reasons as well as the reasons stated in open court on September 19, 2024, the Court denies Defendant's motion.  The pretrial detention order is affirmed.  An appropriate order follows.